Laramore, Judge,
delivered the opinion of the court:
This suit was brought by plaintiff Farwell Company, Inc., to recover from defendant the sum of $35,184.96, which amount was withheld from the amount payable under a contract as the result of a change order which modified the contract so as to permit plaintiff to install copper tubing in lieu of “copper or brass pipe” specified in the contract. The tubing was admittedly not as expensive as the pipe.
The facts necessary to this decision are briefly these: On February 7, 1948, plaintiff entered into a contract with defendant’s Corps of Engineers under which plaintiff was to furnish the materials and perform the work for installation of all mechanical work in the main hospital and the boiler house of the Veterans’ Administration Hospital, Shreveport, Louisiana, in accordance with the contract documents, plans, and specifications. The specifications were drawn up by a firm of architects-engineers under a separate contract between it and the defendant. The firm’s consulting engineer, in preparing the plumbing specifications, used without change, the Corps of Engineers’ Standard Guide Specifications, C. E. — -300.02, dated April 7,1947, which forms paragraph 45-15b of the contract specifications and is as follows:
b. Brass or Goffer: Pipe used for domestic hot and cold water, return circulating hot water, and chilled *834 water, except underground pipe 3 inches in diameter and larger, shall be brass or copper. Threaded fittings shall be brass. Threadless fittings for brazing with silver solder will be acceptable, except for swing joints. The material and dimensions of threadless fittings shall conform to the requirements of Federal Specifications WW-p-460.
Although the Corps of Engineers’ Standard Guide Specifications 300.02 were amended by the addition of the words “copper tubing will not be acceptable” prior to the issuance of the invitation for bids on the job here in question, neither the firm’s consulting engineer nor the plaintiff were informed of this modification and the later addition does not appear in paragraph 45-15b of the contract specifications.
Plaintiff entered on the construction work using type B copper tubing instead of “brass or copper pipe” as called for in the specifications. On or about December 3,1948, the architects-engineers directed plaintiff to suspend further installation of type B copper tubing pending an interpretation of the specifications. It was thereafter determined that the type B copper tubing did not comply with the specifications, but to avoid delay, plaintiff was permitted to continue with the installation of said copper tubing. At that time a change order was issued, together with findings of fact, modifying paragraph 45-lob to permit the use of copper tubing and making an equitable adjustment in the contract price of $35,184.96, the difference in the market price of copper pipe and type B copper tubing.
Plaintiff contends that paragraph 45-15b of the contract specifications is ambiguous where it specifies brass or copper “pipe” and threaded fittings and also permits the use of threadless fittings; that the term “pipe” in specifications and in trade usage includes “tubing” and that the two terms do not have technically exclusive meanings; that it bid on type B copper tubing; that such tubing was satisfactory for the job; and that the Government was not justified in reducing the contract price when plaintiff was permitted to continue installing tubing.
Defendant in its brief recites that the defendant is not contending in this case that type B copper tubing would not give satisfactory results. The Government concedes that *835 it permitted the use of tbe tubing and that it is adequate for the job but it contends it permitted its use only to expedite the job and feels that an adjustment downward in the contract price should be made because of the lesser expense entailed by the contractor in obtaining copper tubing. The Government, contrary to plaintiff’s contention, argues that the use of the term “pipe” in the specifications does not within the ordinary trade usage also means “tubing”.
The question of whether or not “pipe” also means “tubing” was decided by this court when the case was previously before it on cross-motions for summary judgment, Farwell Company, Inc. v. United States, 126 C. Cls. 317, wherein we held that plaintiff was not justified in interpreting paragraph 45-15b as written to permit the use of copper tubing. However, the court at that time found that there were genuine issues of material fact as to (1) whether the defendant has previously accepted copper tubing under the same specification provision as paragraph 45-15b, and (2) whether copper tubing was suitable or conformed with the technical requirements of the contract specifications. Thus, the case was remanded to the Commissioner for further proceedings.
Trial on the above issues was had and in support of the first issue above plaintiff claims that shortly prior to bidding on the contract here in suit it performed the mechanical work on the Veterans’ Administration Hospital, Big Springs, Texas, as a subcontractor, and that type B copper tubing was installed, approved, accepted, and paid for under the same specification provision as paragraph 45-15b here in question.
This contention of plaintiff is in error since the bid on the Big Springs, Texas, job was qualified with a statement that it was based on tubing and the bid was accepted on that basis. Plaintiff, in arguing against defendant’s contention that the bid was qualified to the extent hereinbefore noted, states in its reply brief that “* * * there is not one scrap of evidence in the record concerning the Big Springs Hospital or any ‘qualification’ of the bid on that job.” In response to this statement, we simply point to finding 11, which is taken from an exhibit introduced by plaintiff, and *836 to finding 12. The statements contained in the contracting officer’s memorandum, and the decision of the Claims and Appeals Board therein quoted, indicate without question that the bid on the Big Springs project was qualified to the extent that it permitted the use of copper tubing under a specification similar to 45-15b of the contract in question in the suit now before us. Moreover, this issue was completely abandoned by plaintiff on trial of the case; therefore, any further discussion is unnecessary.
As to the second issue, plaintiff claims that the copper tubing was suitable and, conformed with the technical requirements of the contract specifications, and its use should, therefore, be permitted without any reduction in the contract price.
The Government has stated in its brief that it does not contend that the copper tubing was not suitable. It does say that it did not conform with the requirements of the contract specifications, and quite obviously it did not. It is of no concern to plaintiff why the Government specified brass or copper “pipe” instead of “tubing,” and it was not within plaintiff’s province to substitute its judgment for that of the Government by deciding that tubing was satisfactory when pipe was specified. The Government may have had many reasons for requiring pipe instead of tubing, but in any event the specifications called for pipe and the Government had a right to expect that pipe would be used. In other words, why have a contract if either party could change the terms thereof to suit his particular whim. The easier method would be to say “just build us a good building,” then leave it up to the court in the inevitable ensuing law suit to determine whether the materials used were suitable. This is just what contracts are meant to prevent and an added reason why they could be construed according to their terms, as this court did in its decision on the cross-motions for summary judgment.
Another more important reason for requiring strict compliance with the contract terms in this case is that to permit the use of “tubing” instead of “pipe” when the contract specified “pipe” would be to put the plaintiff in a more advantageous bidding position than other bidders. The *837 plaintiff knew that tubing was much cheaper than pipe and calculated its bid thereon. If the other bidders calculated their bid based on “pipe,” it cannot be denied that plaintiff would be put in a more advantageous position because of the lower cost to it of tubing. True, in this case plaintiff’s bid would have been lower than all of the other bids irrespective of the disparity in price between pipe and tubing, but that is not the point. The situation could have been such that the disparity in the prices would have been the only factor that made plaintiff’s bid lower than those of the competing bidders. We should not create the opportunity for bidders on Government contracts to underbid their competitors by calculating bids on less expensive materials and later support their bid by saying the materials used conform with the technical requirements of the contract specifications and are not of inferior quality. Specifications are used, at least in one sense, to insure uniformity of bidding. The plaintiff calculated its bid on materials that were less expensive than those called for by the contract; therefore, the contract price must be reduced proportionately.
Likewise, the fact that the Government subsequently permitted the use of the tubing does not entitle the plaintiff to its full contract price. The facts show that on January 14, 1949, the chief of engineers advised that the specifications clearly required the use of brass or copper pipe and did not permit the use of type B copper tubing. However, the contracting officer was requested to order the contractor to proceed with the installation of copper tubing to avoid delay, and to negotiate a change order making a suitable reduction in price, or failing in this, to issue a change order containing an amount which the contracting officer considered a proper deduction in accordance with “Article 3. Changes” of the contract. Article 3 provides:
The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for *838 adjustment under this article must be asserted within 10 days from the date the change is ordered. Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of War or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this Article shall excuse the contractor from proceeding with the prosecution of the work so changed.
On March 11, 1949, the contracting officer issued Change Order No. 6, accompanied by his own findings of fact, modifying paragraph 45-15b to permit the use of type B copper tubing. The change order also contained an equitable adjustment downward in the contract price in the amount of $35,184.96. We feel this adequately reflects the disparity in the price of pipe and tubing and that the adjustment was warranted.
We feel that the above sufficiently disposes of the case despite other contentions on both sides which would have no effect on the outcome of the case.
Therefore, we hold that the specifications were not ambiguous, and the fact that the tubing suitably conformed with the functional requirements of the contract specifications does not warrant its use without a reduction in contract price. Plaintiff took a calculated risk when it installed copper tubing instead of pipe as required by the specifications and cannot now complain of the reduction in the contract price.
Plaintiff’s petition is therefore dismissed.
Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
Madden, Judge, concurs in the result.
FINDINGS OE FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
*839 1. Plaintiff, Farwell Company, Inc., is a corporation organized under the laws of the State of Texas, with its principal office in Dallas, Texas, and during all the period of time herein pertinent, was engaged in the business of a mechanical contractor. The plaintiff company has had extensive experience in this field and has done a considerable variety of work including numerous jobs incident to construction of hospitals. The bulk of plaintiff’s work has been and is obtained on the basis of the preparation of competitive bids.
2. On February 7,1948, the plaintiff entered into a contract with defendant, acting through the Corps of Engineers, designated as Contract No. W-16-047-eng-l705, under which plaintiff was to furnish the materials and perform the work for installation of all mechanical work in the main hospital and the boiler house of a Veterans’ Administration Hospital, Shreveport, Louisiana, in accordance with the contract documents, plans, and specifications.
The contract was prepared on War Department Contract Form No. 2 and provided in part as follows:
Article 3. Changes. The contracting officer may at any time, by a written order, and without notice to the sureties, makes changes in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered. Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of War or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this Article shall excuse the contractor from proceeding with the prosecution of the work so changed.
*****
Article 7. Materials and workmanship. * * * When required by the specifications or when called for by the Contracting Officer, the Contractor shall furnish the *840 Contracting Officer for approval full information concerning tlie materials or articles which he contemplates incorporating in the work. Samples of materials shall be submitted for approval when so directed. Machinery, equipment, materials, and articles installed or used without such approval shall be at the risk of subsequent rejection. The contracting officer may require the contractor to remove from the work such employee as the Contracting Officer deems incompetent, careless, insubordinate, or otherwise objectionable, or whose continued employment on the work is deemed by the Contracting Officer to be contrary to the public interest.
$ $!c $ $
Aetiole 16. Payments to contractor.
$ $ * $ $
(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government, but tliis provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all of the terms of the contract.
3. This case was previously before the court on cross-motions for summary judgment, Farwell Company, Inc., v United States, 126 C. Cls. 317, wherein it was held that plaintiff was not justified in interpreting section 45-15b of the contract, infra, as written to permit the use of copper tubing. The case was remanded to the Commissioner at that time because there existed genuine issues of material fact as to (1) whether the defendant had previously accepted copper tubing under the same specification provision as paragraph 45-15b, and (2) whether copper tubing was suitable or conformed with the technical requirements of the contract specifications. It was for the taking of evidence on these issues that the court, by its previous decision, remanded the case to the Commissioner. Plaintiff, however, abandoned that phase of the case relative to the first issue above. There is no dispute as to the amount of damages. If it should be determined that plaintiff is entitled to recover, it is agreed by the parties that the damages amount to $35,184.96. No other action has been initiated on this claim in Congress or through any Department of the United States Government.
*841 4. The design of the mechanical systems and the preparation of specifications for the mechanical work on the subject contract were done by a firm of architects-engineers (hereinafter referred to as the A-E) under a separate agreement between the A-E and the defendant. The A-E subcontracted with a consulting engineer (hereinafter referred to as the C-E) for the drafting, among other mechanical specifications, of the specifications which are Section 45— Plumbing; Section 47 — Heating, Ventilating and Air Conditioning; and Section 48 — Refrigeration Systems and Cold Storage Rooms.
5. Prior to February 8, 1947, the A-E instructed the C-E in connection with the drafting of specifications for water piping to exclude copper tubing and fittings up to three inches and to use iron-pipe-size brass grade A or copper pipe. In the opinion of the C-E this instruction was meant to exclude the use of all copper tubing, including type B, and in his opinion, he drafted these specifications in accordance with such advice.
In preparing the specifications for water pipe, the A-E’s consulting mechanical engineer adopted as paragraph 45-15b of the contract specifications the Corps of Engineers’ Standard Guide Specifications, CE-300,02, dated April 7, 1947, which is as follows:
b. Brass or Copper: Pipe used for domestic hot and cold water, return circulating hot water, and chilled water, except underground pipe 3 inches in diameter and larger, shall be brass or copper. Threaded fittings shall be brass. Threadless fittings for brazing with silver solder will be acceptable, except for swing joints. The material and dimensions of threadless fitting shall conform to the requirements of Federal Specification WW-P-460.
The contract specifications were completed and delivered to defendant on July 30,1947.
Under date of August 28,1947, and prior to the issuance of the invitations for bids on the mechanical work for the Veterans’ Administration Hospital, Shreveport, La., the Corps of Engineers amended the Standard Guide Specification CE-300.02 by the insertion of a sentence which made the paragraph read as follows:
*842 b. Brass or Copper: Pipe used for domestic hot and cold water, return circulating hot water, and chilled water, except underground pipe 3 inches in diameter and larger, shall be brass or copper. *Copper tubing will not be acceptable.* Threaded fittings shall be brass. Threadless fittings for brazing with silver solder will be acceptable, except for swing joints. The material and dimensions of threadless fittings shall conform to the requirements of Federal Specification WW-P-460.
Although addenda were issued to the contract specifications as late as January 8, 1948, neither the C-E who prepared the mechanical specifications nor the plaintiff were informed of the above addition to Standard Guide Specification CE-300.02 and no change was made in paragraph 45-15b of the contract specifications as originally prepared.
Both the C-E and the A-E had knowledge prior to the drafting of the specifications that copper tubing was not acceptable.
6. Section 45, the Plumbing section of the specifications, contains the following:
45-01. SCOPE: The work covered by this section of the specifications consists in furnishing all plant, labor, equipment, appliances, and materials, and in performing all operations in connection with the installation of plumbing, including compressed-air systems, vacuum piping systems for laboratory purposes, central suction systems, gas systems and standpipe systems, complete, in strict accordance with this section, of the specifications and the applicable drawings, and subject to the terms and conditions of the contract.
45-02. APPLICABLE SPECIFICATIONS: The following specifications form a part of this specification:
2. Federal Specifications:
$ ‡ ‡ $
VVVV-P-351. Pipe; Copper, Seamless, Iron-Pipe Size, Standard and Extra-Strong.
ifc íJí
WW-P-371. Pipe; Copper, Seamless, Iron-Pipe Size, Standard.
% sj: #
WW-P-460. Pipe-Fittings; Bronze (Screwed), 125-Pound and 250-Pound.
»f* $ V V ■I’
*843 WW-T-797. Tubing; Copper, Seamless (for General Use with I. P. S. Flanged Fittings).
WW-T-799. Tubing, Copper, Seamless (for use with Solder-Joint or Flared-Tube Fittings).
45 — 03. GENERAL:
‡ $ $ $ $
c. Specifications: Materials required which are not covered by the detailed specifications shall meet the requirements of specifications listed -under paragraph 45-02 above, and shall be of the required class, grade, and type. Shop tests of pipe, valves, and fittings, required by Federal Specifications to be conducted in the presence of a Government Inspector, are waived. *****
45-04. APPROVAL OF MATERIALS:
a. List of Materials, Fixtures, and Equipment: As soon as practicable and within thirty days after award of contract and before any materials, fixtures, or equipment are purchased, the Contractor shall submit to the Contracting Officer for approval, a complete list in triplicate, of materials, fixtures, and equipment to be incorporated in the work, together with the names and addresses of the manufacturers and their catalog numbers and trade names. The Contractor shall also furnish other detailed information, where so directed,_ under the various items. No consideration will be given to partial lists submitted from time to time. Approval of materials will be based on manufacturers’ published ratings. Any materials, fixtures, and equipment listed which are not in accordance with the specification requirements may be rejected and the Contracting Officer shall then have the right to select materials, fixtures, and equipment therefor.
b. Options of the Government: If the Contractor fails to submit for approval within the specified time a list of materials, fixtures, and equipment, in accordance with the preceding paragraph, the Contracting Officer will select a complete line of materials, fixtures, and equipment. The selection made by the Contracting Officer shall be final and binding and the items shall be furnished and installed by the Contractor without change in the contract price or time of completion.
* Exceptions: The product of any reputable manufacturer regularly engaged in the commercial production of plumbing equipment will not be excluded on the basis of minor differences, provided all essential requirements of this specification relative to materials, capacity, and performance are met. The bidder shall furnish a state *844 ment giving a complete description of all points wherein the plumbing equipment he proposes to furnish does not comply with the specification, as well as any exceptions he may take to the specification. Failure to furnish such a statement will be interpreted to mean that the bidder agrees to meet all requirements of the specifications.*
$ * * * *
45-06. MATERIALS AND EQUIPMENT:
*****
c. Brass Pipe: Brass pipe shall conform to the requirements of Federal Specification WW-P-351, grade A.
4 * $ $ #
i. Copper Pipe: Copper pipe shall conform to the requirements of Federal Specification WW-P-377.
# $ $ $ $
1. Fittings for Brass or Copper Pipe: Fittings for brass or copper pipe shall conform to the requirements of Federal Specification WW-P-460.
45-15. WATER PIPE, FITTINGS, AND CONNECTIONS:
*****
b. Brass or Copper: Pipe used for domestic hot and cold water, return circulating hot water, and chilled water, except underground pipe 3 inches in diameter and larger, shall be brass or copper. Threaded fittings shall be brass. Threadless fittings for brazing with silver solder will be acceptable, except for swing joints. The material and dimensions of threadless fittings shall conform to the requirements of Federal Specification WW-P-460.
‡ H* ❖ # #
d. Joints:
(1) Threaded Pipe: After cutting and before threading, all pipe shall be reamed and shall have burrs removed. All screw joints shall be made with graphite and oil or with an approved graphite compound applied to male threads only. Threads shall be full cut, and not more than 3 threads on the pipe shall remain exposed. Calking of threaded joints to stop or prevent leaks will not be permitted. Unions shall be provided where required for disconnection. Threaded swing joints shall be used for all branch connections to risers and mains.
*845 7. There is no ambiguity in paragraph 45-15b of the subject specifications. This paragraph required the use of brass or copper pipe conforming to Federal Specifications WW-P-351 or WW-P-877, and type B copper tubing did not meet that specification.
8. Iron pipe sizes (IPS) will differ in wall thickness and inside diameter (ID) for a given nominal size, depending on whether the pipe is steel or wrought iron, and also depending on whether the pipe is standard, heavy, or extra heavy weight. The only IPS dimension that is constant for a given nominal size, regardless of the material or weight, is the outside diameter (OD).
9. Bids were opened by the Corps of Engineers on the mechanical work for the Shreveport Hospital on or about January 22, 1948. Although- plaintiff’s bid was about $200,000 under the next lowest bidder, an award of the contract was not made to plaintiff at that time because the bids exceeded the Corps of Engineers’ estimates for the work. On or about January 26,1948, plaintiff attended a conference in the Corps of Engineers’ office in Shreveport, Louisiana. The purpose of this conference was to review the plaintiff’s bid to determine whether there was any error in the plaintiff’s bid or in the Government’s estimates for this work. This conference was attended by representatives of the district and the division offices of the Corps of Engineers, by representatives of the A-E, and the C-E who prepared the mechanical specifications.
Plaintiff had available at this conference all of its bid computation sheets, but it did not furnish the Government’s representatives with its bid figures or bid papers. Some of the plaintiff’s bid computation sheets were examined by the defendant’s representatives but none of the witnesses, who were present at this conference, could recall definitely, if an examination was made of the bid computation sheet which covered water piping, but plaintiff’s bid on the item (Piping-Account No. 405.511) which included the water lines in paragraph 45-15b, was one of the items in which plaintiff’s estimated costs exceeded the estimate of the Corps of Engineers. Following the examination of plaintiff’s bid, the Corps of Engineers’ estimated costs for the mechanical work were *846 revised upward and the award of the contract was thereafter made to the plaintiff. It appeal’s from the record that plaintiff’s bid on the water piping under paragraph 45-15b would have been approximately $50,000 higher if it had been computed on the basis of using pipe and threaded fittings.
10. On or about December 3, 1948, the A-E suspended further installation of type B copper tubing pending an interpretation of the specifications and on the same date the A-E requested that the C-E, who had prepared the mechanical specifications, give his comments concerning the use of type B copper tubing under paragraph 45-15b. The reply of the C-E to the A-E on December 6,1948, was as follows:
We have reviewed the requirements of the specifications on copper pipe vs. tubing on the water lines for the above job.
We have no record of receiving the addendum to Guide Specifications CE-300.02, dated 28 August, 1947, which certainly is clear enough as to which type of copper is required. The fact that this addendum was issued makes it apparent that clarification was necessary on previously issued job specifications, and we are of the opinion that as our specifications were written type B copper tubing would comply with them. Actually, on private work, we would unquestionably approve tubing, and therefore considered no special note necessary when we wrote our specifications. Since both WW-P-377 and WW-797 appear in the applicable Federal Specification list, the contractor would have no indication which was desired.
Of course, the final decision on what is desired will rest with the Corps of Engineers, but as far as the service required is concerned, we believe that type B tubing will give satisfactory results.
Under date of December 10,1948, the A-E wrote the following letter to the C-E:
With further reference to Mr. Settoon’s letter of 8 December and your reply concerning the specification requirements for copper water pipe for this job, please note the following paragraphs:
IpS-l'o-b Brass or Copper: “Pipe used for domestic hot and cold water, return circulating hot water and chilled water, except underground pipe 3 inches in diameter and larger, shall be brass or copper * * *”
*847 lf5-€6-i 0offer Pipe: “Copper pipe shall conform to the requirements of Federal Specification WW-P-377.”
Please note that nowhere under the heading, “Materials and Equipment,” is there any reference to any other type of copper pipe, particularly copper tubing, even though the applicable Federal Specifications, Page 45-2, include WW-T-797 and WW-T-799.
Under the list of applicable Federal Specifications a number of standards are listed, including those for tubing, but under Paragraph 45-06 the materials and equipment for tins particular job are segregated.
The Contracting Officer, Col. Alvin B. Moore, has requested an immediate, official interpretation as to just what material is required for this purpose by our specification. It is not a question of our opinion as to the suitability of other types of material which might adequately serve the same purpose but is to be the basis for acceptance or rejection of the copper water pipe materials which are now on hand for this job.
On December 16,1948, the C-E advised the A-E as follows:
We have again checked the specification requirements for water pipe on the above job and believe that paragraph 45-06-i gives the correct specification. Since this is the only paragraph giving specification for copper pipe under the heading “Materials and Equipment,” we believe that any mention of copper in the specifications would refer to that paragraph.
By the same reasoning, we believe that Bateson Co., as contractor for the auxiliary buildings will be governed by the same requirement and also should be required to use fittings in accordance with paragraph 45-06-1, which refers to WW-P-460 for screwed or threadless fittings.
We have checked the list of pipe proposed by the Far-well Co. in your letter dated 10 December 1948 and find it satisfactory except in regard to water pipe, as herein noted, and in regard to compressed air piping which is to be changed to type L hard copper tubing in accordance with District Engineer’s recent request. We assume that this request will also apply to the vacuum piping but it is not specifically so noted.
By letter dated December 17, 1948, the A-E advised defendant of the C-E’s concurrence in the interpretation that paragraph 45-15b of the specifications called for copper pipe complying with Federal Specification WW-P-377.
*848 By letter dated December 28, 1948, the assistant district engineer on behalf of the contracting officer advised plaintiff in part as follows:
í}í $ :}« Hs ❖
It is the decision of this office that the specifications require the use of copper pipe, and that copper tubing in lieu thereof will not be acceptable. Following are the reasons upon which this decision is based.
1. Paragraph 45-15b, “Water Pipe, Fittings and Connections” states “Pipe used for domestic hot and cold water, return circulating hot water, and chilled water, except underground pipe 3 inches in diameter and larger shall be brass or copper. Threaded fittings shall be brass. Threadless fittings * * * will be acceptable, except for swing joints.” Note that the basic reference is to “pipe”, not “tubing.” Also note that “threaded fittings” and “swing joints” are referred to. Tubing cannot be threaded, and swing joints require threaded fittings.
2. Paragraph 45-Í5d (1), “Threaded Pipe”, states “Threaded swing joints shall be used for all branch connections to risers and mains.” Swing joints cannot be made with tubing and threadless fittings. Again the reference is to pipe, which can be threaded.
3. Paragraph 45-06, “Materials and Equipment” lists the various materials specified in the Plumbing Specifications and gives the specification with which they must comply. Herein is listed “Copper Pipe”, subparagraph i, which states “Copper pipe shall conform to the requirements of Federal Specification WW-P-377.” This list does not include copper tubing. Obviously, the use of tubing was not considered, otherwise, the list of materials in paragraph 45-06 would have contained a reference to the appropriate tubing specification.
4. The fact that paragraph 45-02, “Applicable Specifications” lists Federal specifications for tubing as well as pipe does not affect the case, as this paragraph is merely a listing of possible applicable specifications, and lists specifications for other materials not called for in the work.
5. Paragraph 45-04-a, “Approved Materials — List of Materials, Fixtures, and Equipment” states “as soon as practicable and within 30 days after award of contract and before any materials * * * are purchased, the contractor shall submit to the Contracting Officer for approval, a complete list, in triplicate, of materials, * * * to be incorporated in the work * * *. Any materials, * * * listed which are not in accord with the *849 specification requirements may be rejected * * Copper tubing for use under the Plumbing Specifications on this work has never been submitted by you for approval as directed above. Had this been done as specified, the fact that tubing is not acceptable would have been made known to you at the start of the work, instead of at this late date, when some of the tubing has already been installed.
Throughout the specifications, similar sequence of requirements indicate the materials to be used. For example, in paragraph 47-37a, “Piping — Refrigerant,” copper “tubing” is specified. The applicable list of materials for this section is paragraph 47-04, which under subparagraph i lists “copper tubing”, but_ does not list copper pipe. No reference is made to swing joints, as they are not required for tubing. In this instance, tubing was desired, and requirements throughout the section consistently refer to tubing.
The reference in your letter to a dictionary definition of pipe as “Any long hollow tube * * * ” is not applicable. The word “pipe” as used in the trade, and as clearly used in the specifications, is contrasted to the word “tubing”, and has a definite meaning.
On January 4, 1949, the district engineer wrote plaintiff in part as follows:
Reference is made to your letter dated 28 December 1948, concerning the decision of the contracting officer dated 23 December 1948 in which it was stated that copper tubing would not be acceptable for the Veterans Administration Hospital, Shreveport, Louisiana.
The decision rendered is set aside as your request, in your letter dated 9 December 1948, for a hearing before a final decision was made was inadvertently overlooked. The hearing requested will be held in the office of the Architect Engineer at 10: 00 A. M. Thursday 6 January 1949, Shreveport, Louisiana. After the hearing the contracting officer will render a decision on the factual situation, from which you may appeal if you so desire.
Thereafter, in response to an inquiry from the contracting officer, the C-E on January 6, 1949, replied by telegram as follows:
Per your request we wish to give our opinions in regard to the relative merits of type B tubing versus iron pipe size copper pipe. We believe that since 125 psi valves and fittings are used on the lines in question that *850 type B tubing which is good for 200 psi working pressure is quite safe for the pressure involved. The use.of threads on copper pipe reduces the thickness at the point of greatest stress whereas the use of sweat fittings on copper tubing does not reduce the thickness. On our best commercial projects over a long period of years we have never used any heavier copper tubing than type K which is not as heavy as type B. The maximum pressure expected on any of the pipe is approximately 50 psi and we do not hesitate to state that m our opinion the results from the use of type B tubing would be quite satisfactory in regard to long life and safety of the job.
11. The bulk of the type B copper tubing was delivered to the job during March 1948 and the value of the type B tubing was included by defendant in making the periodic payments to plaintiff for the months of April and July 1948. Certification of partial payment estimates by the resident engineer and the representative of A-E did not entail an obligation to interpret specifications with respect to materials required on the job.
It was not the practice of these persons in certifying estimates for payment to check materials for compliance with the detailed specifications, and no such check was made.
After plaintiff was notified by the A-E to suspend further installation of type B copper tubing until the question of the interpretation of Paragraph 45-15b of the specifications could be cleared up, a hearing was held on January 1, 1949, before the contracting officer, pursuant to a request made by plaintiff, for the purpose of permitting the contractor to express his views on the controversy.
Thereafter, on January 10, 1949, the contracting officer forwarded through channels to the office of the Chief of Engineers a request for an interpretation of paragraph 45-15b. The contracting officer’s memorandum is quoted in part as follows:
3. Summarizing the facts presented above, the following appears evident:
a. The specification for copper piping as written is somewhat vague and possible of misinterpretation.
b. The contractor, in bidding on a prior job was confused by an identical specification and qualified his bid on that job, with a statement that it was based on tubing. The bid was accepted on that basis.
*851 c. The contractor bid upon the Shreveport job assuming copper tubing was permissible, basing this upon the decision just rendered on the previous job which he had been awarded. Had he known he was. bidding upon copper pipe, his bid would have been higher by about $50,000. As he was $200,000 under the next bidder, he still would have been low bidder.
d. If decision is made that only copper pipe be used, additional costs of over $100,000 will be borne either by the Contractor or by the Government.
e. If decision is made that only copper pipe be used, this decision should be made fully cognizant that final decision as to where responsibility rests may go against the Government. The decision thus arises as to whether the Government will be benefitted to the extent of over $100,000 by the use of copper pipe should it receive an adverse decision and be required to pay the added costs.
4. In view of the above facts as presented, it is believed that the Government is now receiving from Far-well Company, what it is paying for, that Type “B” tubing for this installation is sufficient in strength and durability, and that the additional cost of installing copper pipe is not justified. The possibility of delay of 90 days or more to the mechanical contractor, and in turn, to the general building contractor has been taken into consideration.
5. It is therefore recommended that the use of Type “B” copper tubing be accepted under the provisions of Par. 45-15b of the specifications.
The contracting officer’s memorandum was intended as a summary of the contentions of the contractor in order to establish a situation which would permit a decision to be made on the use of copper tubing in lieu of pipe. The contracting officer recommended that type B copper tubing be used under the provisions of paragraph 45-15b of the specifications to avoid delay. He did not, and was not then, making an interpretation of the specifications, and he did not believe that the specifications as written permitted the use of copper tubing.
12. On January 14, 1949, the Chief of Engineers advised that the specification clearly required the installation of brass or copper pipe and did not permit the installation of type B copper tubing; but the contracting officer was requested to order the contractor to proceed with the installation of cop *852 per tubing to avoid delay, and to negotiate a change order making a suitable reduction in price, or, failing this, to issue a change order containing an amount which the contracting officer considered a proper deduction in accordance .with “Article 3 Changes’’’’ of the contract.
On March 11, 1949, the contracting officer issued Change Order No. 6, accompanied by his own findings of fact, modifying paragraph 45-15b of the contract specifications to permit the use of type B copper tubing complying with Federal Specification WW-T-797 in lieu of copper or brass pipe, and making an equitable adjustment in the contract price of $35,184.96, the difference in the market price of copper pipe and type B copper tubing as submitted by the contractor. Such change order is based on the fact that pipe was exceedingly difficult to procure and copper tubing was acceptable and available in quantities which would permit the work to progress without interruption. Plaintiff refused to accept the change order.
The contractor protested the decision of the contracting officer, and on April 6, 1949, appealed the decision to the head of the department. After a hearing, the Corps of Engineers Claims and Appeals Board rendered a decision denying the appeal.
The decision of the Claims and Appeals Board is quoted in part as follows:
. The dispute before this Board may be narrowed to a single issue; i. e., whether or not under the contract specifications, type B copper tubing may be furnished and installed by the appellant. The appellant contends that piping is actually a conduit and that any copper or brass pipe or tubing which has the strength to carry the water pressure indicated by the prescribed fittings would comply with the requirements of the contract specifications. The difficulty in considering such argument conclusive stems from Paragraph 45-15b (heretofore quoted) which provides in pertinent part that pipe used for domestic hot and cold water shall be brass or copper.
Under Paragraph 45-06, entitled “Materials and Equipment,” it is provided that brass pipe shall conform to Federal Specifications WW-P-351, Grade A, copper pipe conform to Federal Specifications WW-P-377, and that fittings for brass and copper pipe shall conform to the requirements of Federal Specifications *853 WW-P-460. This latter requirement is repeated in Paragraph 45-15b. It has been suggested that there is an ambiguity in the specifications, evidence of which is the modification in the Guide Specifications which added a statement to the effect that copper tubing would not be acceptable. To concede that such a defect in the contract specifications here under consideration is present, it must be found that there is a real uncertainty in the language. Where words are reasonably clear when read in their arrangement by persons reasonably familiar with the subject matter, such words must be given their usual and customary meaning. In the instant appeal, we are considering specifications governing mechanical installation in a large structure, the cost of such installation exceeding two million dollars. The appellant contractor is thoroughly competent and experienced on work of the type undertaken by this contract. In one prior job, based upon identical specifications, this appellant stipulated in its bid that its quotation was based upon furnishing and installing copper tubing. This qualification was for the alleged purpose of clarifying its proposal as testified to by appellant at a hearing before this Board with respect to its bid for work on the Big Springs Veterans Hospital Project let by the Albuquerque Engineer District. It was alleged that the specifications for the Big Springs Veterans Hospital were identical with those here under consideration with the exception that an addendum permitted the use of Type K copper tubing under certain specified circumstances. This appellant stated that, in order to clarify its proposal, it contemplated using copper tubing throughout the construction of the Big Springs project, a statement specifically calling attention to such intention being included in its proposal. The record shows that the general contractor also included a similar statement in its bid. (The appellant was the subcontractor on the project at Big Springs). The appellant further testified that the use of tubing on the Big Springs Project was cleared through the Office of the Chief of Engineers and approved and that, therefore, in the instant case using identical specifications, with the exception of the addendum referred to above in the Big Springs job, it was not considered that there would be any question as to the acceptability of tubing.
With reference to the inference allegedly drawn by the appellant that by reason of the action under the Big Springs project it was warranted in assuming that copper tubing was acceptable, it does not appear to this *854 Board that such inference follows. In the Big Springs job the Addendum specifically changed the specifications and allowed the use m limited instances of copper tubing. So that there would be no misunderstanding, the appellant, in particular, qualified its bid to cover the use of copper tubing in instances not covered by the Addendum. A contrary inference could be drawn. If it was deemed necessary to amend the original specifications (identical with those here involved) to permit the use of copper tubing in any particular, then it would follow that the basic specifications, both under the Big Springs job and that here under consideration, could not be reasonably interpreted to allow copper tubing in lieu of the pipe designated.
The appellant testified threadless fittings and silver solder are not used with pipe as further evidence of the acceptability of tubing. ' No support for such a view has been found by this Board.
The basis for the contention that “pipe” includes “tubing” and that only in a technical sense could the specification reference to copper pipe relate solely to “pipe” and not include copper “tubing” is not understood. An examination of catalogs of principal plumbing manufacturers and suppliers demonstrates the distinction between these items, and other investigations made by this Board fully indicate the two materials are not similarly classified. For example, the following is observed in Catalog No. 49 of the Crane Company, 836 South Michigan Avenue, Chicago, Illinois, which firm was founded in 1855 and is presently an outstanding manufacturer in its field with branch offices and plants in a nationwide organization. On page 408 of this catalog there is a tabulation of various types of copper tubing following a caption “Copper Water Tube.” On page 464 there appears a tabulation with respect to copper and brass, pipe, directly below a title “Bed Brass and Copper Pipe.” The index of this catalog was checked for any evidence of classification as similar materials, but pipe and tubing were thoroughly distinguished. Under a heading, “Copper,” pipe and tubing are listed separately. Under the term “pipe” there appear references to both copper and brass (the only materials here under consideration), and no reference is made to “tubing.” Likewise, under “tubing” there is no reference to “pipe.”
The fact that the Guide Specifications were amended to specifically, exclude tubing does not of itself indicate an ambiguity in the specifications. From investigations *855 made, it appears that the prohibition was included to place all bidders on notice in advance of bidding that bids proposing tubing would not be acceptable. The appellant, in the Big Springs job, to the same degree qualified its bid as a subcontractor. Specifications are often modified to insure against the receipt of a bid proposing certain changes in materials or methods of work rather than to remove existing ambiguities.
Section 45 of the contract specifications covers “Plumbing.” Under paragraph 45-01 thereof, entitled “Scope,” it is provided:
“The work covered by this section of the specifications consists in furnishing all plant, labor, equipment, appliances, and materials, and in performing all operations m connection with the installation of plumbing, including compressed-air systems, vacuum piping systems for laboratory purposes, central suction systems, gas systems and standpipe systems, complete, in strict accordance with this section of the specifications and the applicable drawings, and subject to the terms and conditions of the contract.”
The following paragraph, No. 45-02, entitled “Applicable Specifications” and relating to all the systems included in Section 45 (Plumbing) includes a reference to copper tubing in the list of specifications therein outlined. Under paragraph 45-06, entitled “Materials and Equipment,” 25 items citing applicable Federal Specifications are set forth. This list includes copper and brass pipe, as well as fittings for the same, but makes no reference to copper tubing. The only reference in the Plumbing section (45) is the inclusion of Federal Specification WW-T-797 in the general list of applicable specifications set forth in Paragraph 45-02. It is to be noted that this list immediately follows a statement of the scope of the work under the Plumbing section of the specifications wherein reference is made to the installation of plumbing, including compressed air systems, vacuum piping systems for laboratory purposes, central suction systems, gas systems and standpipe systems, and would not support a conclusion that copper tubing is to be permitted for use in hot and cold water lines. It is considered that the inclusion of such a reference in Paragraph 45-02, which is for general application to all plumbing systems, should not have misled the appellant, particularly in the light of other specific references to applicable Federal Specifications made pertinent to particular work. For example, under paragraph 45-15, entitled “Water Pipe, Fittings, and *856 Connections,” in subparagraph b thereof, brass or copper pipe is prescribed for domestic hot and cold water lines, and Federal Specification WW-P-460 is specifically cited.
Upon inquiry by this Board, it developed that the other bidder for this work did not interpret the contract requirements to permit the use of tubing but required pipe, and the bid was prepared accordingly. It must be presumed that this appellant was not without some degree of doubt in the prior letting under identical specifications when it qualified its bid to propose the use of tubing throughout the job following an addendum permitting the use of tubing in certain particulars.
This Board has considered at great length the contentions of the appellant concerning the acceptance and payment for material delivered at the job site some few months before installation began; and the fact that tubing would meet the requirements of the Government and all water pressure required of the fittings prescribed. Such contentions have some degree of merit. However, acceptance of materials by inspectors or persons other than those authorized under the express language of the contract would, if not in compliance with contract requirements, be, in effect, a modification of the contract. This is not authorized, and, consequently, would not create any liability on the part of the Government.
It is the conclusion of the Board, therefore, that, under the contract specifications, the appellant was required to furnish and install pipe as distinguished ■ from tubing in the hot and cold water lines at this project, and that the acceptance of copper tubing by the Government entitles the Government to an adjustment in the contract price.
13. The terms “pipe” and “tubing” are not used interchangeably in specifications or in the trade, and technically these terms have exclusive meanings. The term “copper pipe” as used in specifications and in the trade excludes all types of copper tubing, including type B.
The Copper and Brass Research Association, which is a trade association, develops and publishes standards for the trade covering terminology, dimensions, weights, and tolerances on copper and brass products, including pipe and tubing manufactured for sale on the open market. This association defines “pipe” as excluding all types of tubing, and has developed and published in cooperation with the *857 trade, a separate and distinct standard on “pipe”, which standard excludes type B copper tubing.
The Chase Brass and Copper Company, from which the material for this job was ordered, segregates “Bed Brass and Copper Pipe,” “Copper Water Tube,” and “Type £B’ Copper Tube” into three “distinct” groups. Other suppliers make a like distinction between these products.
The American Society for Testing Materials, a technical association, in its publication of specifications for “General Requirements for Wrought Seamless Copper and Copper-Alloy Pipe and Tubing” segregates “pipe” from “tubing” by definition and on the basis of specifications, using the terms “copper and brass pipe,” “copper water tube,” and “copper tube, type B sizes.”
14. Copper pipe because of its wall thickness can be threaded, and it is customarily used with threaded fittings. By 1932 there had been developed types of copper water tube, among which were types K, L, and M, for use with fittings which were soldered or sweated, rather than threaded, by shaving, in effect, from the outside of copper pipe material which had theretofore been used for threading. Copper water tube does not have the outside diameter, inside diameter, or wall thickness of copper pipe. Where copper tubing is used in plumbing construction, it is customary to use types K and L copper water tube.
Type B copper tubing was developed, along with a number of other similar types of copper tubing, by the United States Navy sometime prior to 1933, to be used for a variety of purposes. This product was not developed for, and. is not normally used in, commercial or residential plumbing construction. It was developed, in effect, by shaving from the inside of copper pipe the material previously used for threading. The outside diameter of type B copper tubing is related to the outside diameter of copper pipe, but this tubing does not have either the wall thickness or inside diameter of copper pipe.
From its inception, copper tubing has been made either hard or soft, that is, either annealed or in straight lengths. Types K and L come in both straight lengths and coils; types M and B come only in straight lengths.
*858 15. The Copper and Brass Research. Association, the American Society for Testing Materials, the manufacturers of copper and brass products, and the mechanical contractors, all regarded and classified type B tubing and the other types of tubing designed for use with IPS threadless fittings as conduit that was different from copper pipe..
16. The 125-pound IPS threadless fittings in accordance with Federal Specification WW-P-460, referred to in paragraph 45-15b of the plumbing specifications, had to be used with brass or copper pipe.
17. Plaintiff filed a motion for call on the Department of the Army for the following data:
Letters, memoranda, notes and transcripts of meetings and conferences relating to the amendment of the Corps of Engineers Guide Specifications CE 800.02 under date of August 28, 1947 by the addition thereto of the sentence, “Copper tubing will not be acceptable”.
This motion was allowed by the Court and call was made on the Department of the Army on September 22, 1954. The Office of the Judge Advocate General answered the said call for the Department on November 9,1954, as follows:
The Chief of Engineers has informed this office that a thorough search of the files of the Corps of Engineers made in an effort to comply with the Call failed to disclose any material of the nature covered by such Motion for Call and Call, and that apparently no records were made in connection with the preparation of an amendment to the Corps of Engineers Guide Specifications, CE 800.02, under date 28 August 1947.
18. As a prospective bidder for the subject contract, plaintiff requested from the Corps of Engineers a set of plans and specifications and received therewith a document dated December 3, 1947, giving instructions to such prospective bidders in connection with the contract specifications. Such instructions provided in part:
5. Bidders should carefully examine the drawings and specifications, visit the site of work and fully inform themselves as to all conditions and matters which can in any way affect the work or the cost thereof. Should a bidder find discrepancies in, or omissions from, the drawings, specifications or other documents, or should *859 he be in doubt as to their meaning, he should at once notify the contracting officer and obtain clarification prior to submitting any bid.
Plaintiff’s president, who checked and approved the bid and analyzed the specifications on this contract, testified that he considered paragraph 45-15b to be ambiguous, but there is no evidence that he requested any clarification of this paragraph of the specifications from defendant.
19. Although plaintiff submitted for the contracting officer’s approval, in accordance with the requirements of paragraph 45-04a of the specifications, lists of material to be incorporated into certain parts of the work, plaintiff did not submit any list of materials to be used on the interior plumbing, or secure any approval of such materials prior to their installation. Had plaintiff complied with the specification requirements by submitting a list of materials to be used under paragraph 45-15b of the specifications, it would have been advised that copper tubing was not acceptable.
20. Tubing is nowhere mentioned in the plumbing specifications, except in paragraph 45-02 which is a general list of all Federal specifications by number which may or may not be called for on the plumbing construction. This paragraph includes a number of Federal specifications for materials not required on this plumbing job. Among such Federal specifications are SS-P-361, SS-T-310, WW-T-797 and WT-799. Paragraph 45-03c referred the contractor to paragraph 45-02 only for those materials required but not otherwise specified. Paragraph 45-06 entitled ‘“Materials and Equipment” gives the Federal specifications for both copper pipe and brass pipe, but no specification for copper tubing. This paragraph, together with the following detailed paragraphs in the specifications, listed all of the materials required on this plumbing construction. Since there was no requirement in paragraph 45-15b that the contractor use copper tubing on the domestic water lines, it was not necessary for him to refer to the Federal specification for copper tubing in the general list under paragraph 45-02.
21. The weight of the evidence shows that there is no ambiguity in paragraph 45-15b of the subject specifications, that this paragraph calls for pipe conforming to Federal *860 Specifications WW-P-377 or WW-P-351, and that type B copper tubing, used here by the contractor, did not meet the technical requirements of the specifications.
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and its petition is therefore dismissed.

Single asterisks appear before and after new or revised material.

Added by Addendum No. 1, September 30, 1947.