ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| Industrial Consultants, Inc. | ) ASBCA Nos. 59622, 60491 |
| DBA W. Fortune & Company | ) |
| | ) |
| Under Contract No. W912WJ-13-M-0223 | ) |

APPEARANCE FOR THE APPELLANT:     Mr. William Fortune
                                  Owner

APPEARANCES FOR THE GOVERNMENT:   Thomas H. Gourlay, Jr., Esq.
                                    Engineer Chief Trial Attorney
                                  Theresa A. Negron, Esq.
                                    Engineer Trial Attorney
                                    U.S. Army Engineer District,
                                    New England

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

These appeals arise from a contract to upgrade heating, ventilation and air conditioning equipment at a facility in New Hampshire. The government's termination of the contract for default is at issue in ASBCA No. 59622, and appellant's money claim in ASBCA No. 60491. The Board conducted a hearing in Boston, Massachusetts, on 16 November 2016, at which both parties were allowed to present witnesses and evidence. The Board admitted into evidence the government Rule 4, tabs 1-67, supplemental R4, tabs 68-91; and appellant supplemental Rule 4, tabs 1-22, as well as two additional exhibits from appellant. As set forth in this opinion, we deny the appeals.

FINDINGS OF FACT

Contract Formation

1. This project was intended to upgrade the heating, ventilation and air conditioning (HVAC) equipment at the Child Development Center at the Cold Regions Research and Engineering Laboratory (CRREL) in Hanover, New Hampshire, whose occupants were experiencing "thermal comfort" issues due to an undersized system. The scope of work was limited by budget constraints but was to include replacement of the air handling and condensing units, the variable air volume terminal units, and the existing louvers, as well as ductwork modifications. (R4, tab 4 at 6, 18, tab 25 at 3; tr. 82)

2. The solicitation informed prospective bidders that the U.S. Army Corps of Engineers (Corps) would conduct a prebid site visit which it "urged and expected" prospective bidders to attend and that the contract would include FAR 52.236-2, DIFFERING SITE CONDITIONS; and 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (R4, tab 6 at 52, *see* tab 4 at 29). Despite this, appellant, Industrial Consultants, Inc. (ICI), did not attend the site visit (R4, tab 8 at 3).

3. ICI's bid price of $175,020 (including three optional items) was low by a considerable margin. The next low price of $237,402 was more than 35 percent higher. (R4, tab 10)

4. Due to the budget constraints, the awarded contract did not include the options (tr. 17). The parties entered into the contract effective 12 September 2013 at a price of $144,680 (R4, tab 4 at 4).

5. The contract provided more than a year (to 15 September 2014) to complete the work. This was due to work on the electrical system by another contractor that would not be completed until 15 July 2014. Work on site could only be performed on no more than four consecutive weekends after the 15 July 2014 completion of the electrical work. (R4, tab 4 at 9-10)

6. One of the contract requirements that is of interest to this dispute is a standard requirement that the contractor provide submittals to the contracting officer, who had to approve them before work could start on site. These submittals included an accident prevention plan and product data for the air handling unit and other equipment. (R4, tab 4 at 14-17)

Contract Performance

7. ICI visited the site for the first time on 8 October 2013 (tr. 190-91; R4, tab 17 at 2-4). ICI's president and owner, William Fortune, concluded after this visit that the design provided by the government had significant problems (R4, tab 17 at 2-4). Mr. Fortune then began a campaign to redesign the work, which he refused to drop no matter how many times the Corps told him to build as designed.

8. The contract required ICI to bring all submittals to the preconstruction conference, which was held on 29 January 2014 (R4, tabs 22, 24), so that they could be distributed to the participating reviewers (R4, tab 4 at 12), but it failed to bring them to the conference (*see* R4, tab 26 at 2-3). (ICI had made a "preliminary" submittal for the air handling unit on 27 January 2014 (R4, tab 21), but the contract had no provision for submission or review of preliminary submittals.)

9. ICI's concerns about the design ripened into the submission of a request for information (RFI-1) on 11 February 2014 (supp. R4, tab 76). The Corps provided an initial response on 28 February (R4, tab 25), and an amended response on 4 March 2014 (R4, tab 77). Selected comments from RFI-1 and the Corps response are as follows:

> ICI - The kitchen exhaust hood duct is grossly undersized....

> Corps - The kitchen exhaust system is not part of this project.

> ICI - There should be no air returns into the conditioned air system in the kitchen to prevent odors and smoke from entering other parts of the building.

> Corps - The contractor shall follow the contract documents.... [T]he existing kitchen hood manufacturer has stated that the existing system is acceptable for the amount of cooking performed in this kitchen.

> ICI - There is no technical reason to replace these louvers.

> Corps - The louvers [are to be] replaced because intake and exhaust flows have increased and the existing louvers are not designed to handle the increased flows. Louvers shall be installed as designed.

10. The Corps project engineer, Patricia Devine, summarized the Corps' response in an email transmitting the amended RFI response by stating that the "long-and-short of it is to install the system as designed. Please send in your submittals so we can begin our review and get this contract moving." (R4, tab 77 at 2)

11. The Corps still had not received the submittals on 10 March 2014, leading the contracting officer to send ICI a cure letter listing all of the outstanding submittals. The contracting officer stated that ICI's failure to provide the submittals was endangering contract performance and that failure to cure the deficiencies within 10 days might result in termination of the contract for default. (R4, tab 26 at 2-3)

12. Mr. Fortune replied to the Corps' RFI-1 response with an email on 27 March 2014, in which he made a "Demand for higher authority and competent engineering review." Among other things, Mr. Fortune accused the Corps of having "copied the design of the failed HVAC system" and stated that ICI could not "be held responsible for a failed design." (R4, tab 29 at 2-3)

3

13. The contracting officer responded by letter dated 7 April 2014. In it she informed Mr. Fortune that the work was "part of a minor rehabilitation of the existing HVAC system." She stated that the design addressed the needs identified by the client but the scope of work did not provide for a major redesign of the system. She stated that the original cure notice was still in effect but extended the response date to 10 days from receipt of the 7 April letter. (R4, tab 30)

14. Thereafter, the Corps requested ICI participate in a conference call "to go over options and try to determine how we can best proceed for everyone involved" (R4, tab 31). As a result, the parties had two telephone conversations on 14 April 2014. After the first, Mr. Fortune sent an email in which he contended that "satisfactory construction cannot be completed because the engineering department of the Army Corps of Engineers has failed to design a system that will function properly." (R4, tab 32 at 3) This appears to be based on his contention that the design of the current system was faulty and that the Corps should have redesigned it because "making it larger fails to correct the deficiencies and apparent design errors" (*id.*). However, after a second conversation, the Corps documented Mr. Fortune's agreement to proceed with the contract "per the scope of work" and to provide the submittals (R4, tab 33). On 25 April 2014 the Corps requested ICI confirm it would perform the contract as written, to which Mr. Fortune responded "You have bullied us into compliance; we intend to complete the contract" (R4, tab 38).

15. ICI provided some of the submittals in April 2014. The precise date is not clear and they may have been submitted on several different dates (*see* R4, tabs 34-37, 39-40). In a memorandum dated 27 May 2014, the Corps mechanical designer rejected the submittals for the air handler, the variable air volume boxes, the diffusers, the duct and insulation, and what the parties labeled "Trane: Using VAV Boxes" (R4, tab 42 at 2; tr. 82). The most controversial of these appears to be the air handler. In explaining the air handler rejection, the engineer listed a combination of questions (for example, "Does fan have Variable frequency drive?") and comments (observing that the contract drawings require sensible cooling of 259.5 MBH while the submittal showed only 190 MBH and concluding that "[t]his unit is undersized.") (R4, tab 42 at 2).

16. On 28 May 2014, the administrative contracting officer (ACO) rejected ICI's accident prevention plan, stating that the plan did not follow the format required by the contract, namely the Corps Safety Manual, EM 385-1-1, Appendix A, (R4, tab 4 at 14-15), which the Corps had previously provided ICI (*see* R4, tab 23 at 4, tab 39). Among other things, the ACO stated that "[m]any items have been omitted to include the identification and documentation of qualifications of the Site Safety and Health Officer; Safety Training; Safety Inspections; Accident Reporting Requirements; and Emergency Response Plan." (R4, tab 44 at 2) ICI resubmitted the

4

accident prevention plan on 16 June 2014 but the ACO rejected it again on 23 June 2014 for similar reasons (R4, tab 51 at 2).

17. With respect to the other submittals, ICI submitted a five-page document that addressed some of the concerns listed by the Corps engineer on 27 May, which led the Corps to approve the diffusers on 11 July 2014, but the engineer again rejected the air handler, asking once more if the fan had a variable frequency drive, among other things (R4, tab 53 at 4).

18. In an email to the Corps project engineer on 22 July 2014, Mr. Fortune asked for permission to "allow us to make whatever changes that are necessary to the existing system that will meet the tenants['] requirements" (R4, tab 57 at 3). Reacting to this in an internal email, one Corps employee observed "He cannot seem to get over the idea that he cannot propose a system rather than simply execute the contract as agreed" (*id.* at 2).

19. The Corps met with Mr. Fortune on 1 August 2014 in a last attempt to work things out. The contracting officer sent a letter on 12 August 2014 that documented the discussions at that meeting (R4, tab 62). With respect to the air handler and the variable frequency drive (VFD), the Corps expressed concern that ICI had not submitted the VFD and it, therefore, could not determine if they were compatible. (Mr. Fortune had informed the Corps by email on 18 July 2014 that there would be a VFD (R4, tab 55 at 3).) The Corps informed Mr. Fortune that this portion of the air handler would be approved once ICI submitted the VFD and the Corps found it to be acceptable.

20. Based on Mr. Fortune's testimony at the hearing, it appears he did not want to submit the VFD to the Corps until after it approved the air handler. He testified that it "didn't register" with him until the 1 August meeting that the Corps was holding up the air handler submittal because of the VFD. (Tr. 145-47) There is no provision in the contract that allowed ICI to withhold the VFD submission until the Corps approved the air handler unit (AHU).

21. In the 12 August letter, the contracting officer stated that the hot water coil had been rejected by the Corps because it had to be compatible with the existing boiler and that the coil was too large (R4, tab 62 at 4). The contracting officer stated that the variable air volume boxes ICI had submitted could not meet the pressure drop requirements and that ICI would have to submit a different product (*id.*).

22. The contracting officer also stated that there had been a lengthy discussion about the return fan at the meeting. Mr. Fortune had suggested a value engineering change that would use a smaller fan than shown in the contract and that he had not included the larger fan in his bid. The Corps declined the proposed change and instructed ICI to submit the return fan and install as required by the contract. (R4, tab 62 at 4, tab 61 at 2)

5

23. Five days after the meeting, Mr. Fortune sent the project engineer an email in which he again challenged the design and effectively announced ICI's intent not to perform the contract. He stated that due to the issues he had uncovered from the site visit and review of the plans "we have spent any money that was in the contract for overhead and some onsite labor." He further stated that "We contend that there is too many ambiguities and your refusal to work together to resolve several design issues, for the benefit of the customer and society in general, have made the execution of this contract impossible." (R4, tab 61)

24. The contracting officer sent what she labeled a third cure notice on 26 August 2014 (the record does not contain a second cure notice). Among other things, the contracting officer stated that if ICI did not provide the required submittals within 10 days, this may result in termination of the contract for default. She stated that the work must be "completed and installed as designed, per the contract requirements." (R4, tab 64 at 2-3) Mr. Fortune responded with an email on 7 September 2014 in which he requested that the Corps "turn this contract into a design build and allow us to make the necessary changes to the system" (R4, tab 65 at 2).

25. As far as we can determine from the record and the testimony at the hearing, ICI never performed any work on site (other than site review) and never ordered the equipment (R4, tab 63 at 3; tr. 177-78). As for the required submittals, ICI never submitted the VFD[1] (tr. 46, 48) or the return fan (tr. 47). The Corps rejected the accident prevention plan (tr. 43), and the variable air volume units (tr. 43-47; R4, tab 62 at 4). The Corps conditionally accepted part of the air handler pending submission of the VFD, but, as we observed, ICI never submitted the VFD, and the Corps rejected the hot water coil (tr. 46; R4, tab 62 at 3-4).

Termination

26. The contract included FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (R4, tab 4 at 29). On 17 September 2014 (two days after the contract completion date), the contracting officer terminated the contract for default. As reasons for the termination, the contracting officer cited: "your firm's lack of response regarding USACE's request for required submittals, and to complete the contract as written." (R4, tab 2 at 2) ICI appealed that decision on 11 October 2014, which we docketed as ASBCA No. 59622.

---

[1] The list of product submittals in the contract does not include the VFD (R4, tab 4 at 17). However, the contract does list the "Variable Air Volume Units" as a required submittal and drawing M-703 speaks of the VFD under the heading "VARIABLE AIR VOLUME SYSTEM WITH RETURN FAN" (R4, tab 5 at 265).

6

ICI's Money Claim

27. On 1 December 2015, ICI submitted a request for a contracting officer's final decision in which it sought to have the termination converted to one for the convenience of the government and for the government to pay ICI for costs incurred. ICI contended that the government provided defective specifications, failed to cooperate in approving submittals in a timely manner, breached the government's implied warranty of design and violated international building codes. ICI stated that "[t]his conduct caused inordinate delays and made it impossible for ICI to perform." (Supp. R4, tab 71 at 2) ICI raised 11 delays or purported grounds for relief in this claim. ICI addressed them to varying degrees during its presentation at the hearing. We will address them in order of the depth of presentation, starting with the subject receiving the most testimony, the feasibility of the design. (*See* tr. 158-69, 202-05)

Design Issues: Louvers/Return Fan/Kitchen Design

28. ICI presented the louvers, return fan, and kitchen design as three separate issues in its claim (supp. R4, tab 71 at 25-27, 30-32). But during the hearing Mr. Fortune's testimony suggested a linkage between the issues and as they all arise from an allegedly defective design, we will discuss them together.

29. According to ICI's claim, the contract called for "increasing" the size of the existing intake and exhaust louvers but when Mr. Fortune went to the site he found that the dimensions of the existing louvers were the same size as the louvers to be furnished under the contract. Mr. Fortune brought this to the attention of the Corps and offered a credit, but it refused to change the contract. (Supp. R4, tab 71 at 25)

30. Even if ICI's description of the contract's louver requirements were accurate, it is not clear how an insistence on following the contract in and of itself would cause a delay. But it is not accurate; the contract indicated that the louver size would not change:

> The intake and exhaust louvers are to be replaced due to increased airflows. The contractor shall provide louvers in accordance with section 23 00 00 in Appendix A. The louvers shall fit into the current wall openings in the basement mechanical room.

(R4, tab 4 at 18) (Emphasis added)

31. The specification provided various requirements for the new louvers including that they should be six-inches deep, made of an extruded aluminum alloy and factory coated with a clear anodized finish (R4, tab 5 at 17). Thus, the contract

clearly indicates that the new louvers were to be of the same size as the existing louvers (as Mr. Fortune found when he measured them) but that they were intended to be an upgrade. The Corps explained to ICI in its response to RFI-1 that the louvers were to be replaced due to increased air flow (supp. R4, tab 77 at 5).

32. In the claim, ICI also contended that the 10-foot distance between the louvers violated "international building codes" (supp. R4, tab 71 at 30). Although not entirely clear, the spacing between the louvers ties into ICI's goal of eliminating the return fan because it wanted to redesign the system to relieve the exhaust air in a different part of the building, rather than through the exhaust louver, which would allow the return fan to be eliminated (tr. 166; R4, tab 17 at 3; supp. R4, tab 71 at 30). However, any credence we might give Mr. Fortune's opinion that the existing louver spacing violated a building code was negated by ICI's own expert who testified that they did not violate code (tr. 202-05).

33. ICI contends that the return fan was unnecessary and was not shown in the basis for design (supp. R4, tab 71 at 30). However, this fan is listed in numerous places in the contract, including: as a product that required a submittal (R4, tab 4 at 17); in the statement of work under technical requirements (*id.* at 18); and on drawings M-102 (the basement floor plan where it is referred to as "RF-1") (R4, tab 5); and M-601, which is the equipment schedule and details (*id.*).

34. Thus, ICI signed a contract that clearly required a return fan. The record indicates that either it did not notice the return fan requirement or it gambled that the Corps would agree to delete it (*compare* R4, tab 61 at 2 *with* tab 62 at 4-5). In support of its contention that the return fan was unnecessary, ICI offers five pages of handwritten calculations (app. supp. R4, tab 13 at 84-88). However, neither Mr. Fortune nor any other witness explained these calculations and, we do not know what conclusions we are supposed to draw from them. Further, ICI's expert did not opine that the return fan was unnecessary.

35. In sum, we find that ICI has not proven that the Corps provided a defective louver design due either to the size of the louvers or the distance between them. We find that the contract required a return fan and that ICI failed to demonstrate that the fan was unnecessary. We find that there is no evidence that the contracting officer acted unreasonably in enforcing the contract as written. Accordingly, we find that ICI has not proved that the Corps caused any delay related to the louvers or the return fan.

36. Finally, we observe that in testimony we found difficult to follow, Mr. Fortune linked the louver issue to another separate ground for relief in the claim, namely a contention that the Corps also delayed the project because the design "would continue an existing defect that the kitchen was very hot and not being cooled," and that this violated the international mechanical code (supp. R4, tab 71 at 26). However,

Mr. Fortune undermined this contention at the hearing by stating "according to this guy [ICI's expert] who just reviewed the plans somehow we got all mixed up here and there were, there was more air in the kitchen than I originally thought" (tr. 162). Mr. Fortune then appeared to abandon this ground for relief stating "the kitchen problem was not that big of a, may not have been a big of a problem" [sic] (*id.*). ICI's expert later testified that the method of cooling the kitchen was not a code violation (tr. 205). To the extent not abandoned, we find that ICI has not proven any design defects related to the kitchen.

AHU Submittal

37. One of the central goals of the project was to replace the existing AHU with a 21.6 ton unit[2] (R4, tab 4 at 18). ("Ton" in this sense refers to the number of tons of 33-degree water that the unit can freeze in 24 hours (tr. 215-16).)

38. At the hearing, ICI offered testimony from Mr. Fortune and ICI's expert, John Cass, concerning the Corps' rejection of the submitted AHU (tr. 130-41, 210-13). The Board found some of this testimony to be unhelpful because it did not address issues that are actually in dispute. Although not easy to follow, the crux of this testimony seemed to be that ICI had submitted a 20.5 ton AHU, which was somewhat larger than the 20-ton unit required by the contract (according to the testimony); this difference was insignificant and should not have been a basis for rejection (tr. 130, 210). Unfortunately, this testimony is unmoored from the facts of the case. First, the contract required a 21.6 ton AHU, not 20 tons as the testimony indicated. Second, and more importantly, the Corps never rejected the AHU because it was the wrong number of tons. (R4, tab 42 at 2, tab 53 at 4) Thus, the Board did not understand the purpose of this testimony.

39. From a thorough review of the record, the Board has identified three issues surrounding the submittals that delayed or prevented approval. First, as already stated, ICI waited more than seven months into the contract term to submit the various products (that is, those that it actually submitted). Second, with respect to the AHU, ICI submitted information on a series of air handlers that came in various sizes. The Corps found that the information submitted did not address the specifics of the project. (Tr. 84-85, 101-03) ICI's expert acknowledged that the AHU submittal "confused" the Corps engineer (tr. 212).

40. The questions/comments raised by the Corps engineer with respect to the AHU do not appear to have been insurmountable (for example, "a. Does fan have Variable frequency drive? b. The drive package selection was not designated therefore could not verify characteristics associated with it."). (R4, tab 42 at 2) Generally, the

---

[2] The record indicates that the existing unit may have been a 12-ton unit (R4, tab 63 at 3).

parties to a government contract are expected to proceed in good faith and in a cooperative manner. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). The record indicates, however, that Mr. Fortune could not or would not work through the submittal issues. Rather, when questioned, his *modus operandi* was to become aggressive, often lashing out at Corps personnel rather than addressing the issues (*see* R4, tab 29 (demanding "competent engineering review"), tab 32 at 3 (calling the contracting officer "unqualified" to state that the design met the needs of CRREL), *id.* at 4 (stating that the Corps engineering department "needs to be investigated for fraud for paying people to do engineering work that they are not doing. Their actions are giving the engineering profession a very bad reputation."), tab 38 ("You have bullied us into compliance"), tab 55 at 2 ("At this point I see no sense to meet with people who apparently are incapable of reading, comprehending or understanding the issues that we have submitted thus far.... We are not in the business of training or schooling entry-level technicians or less qualified people in the design and construction of HVAC systems."); supp. R4, tab 68 at 25 ("Did you ever hear of water freezing?"), tab 71 at 22 ("If the 'engineer' can't understand [that the submitted heating coil meets contract requirements] there is no explanation that I can give that will enable them to understand; they will have to go back to High School.")).

41. This is unfortunate because it is possible that the submitted AHU would have worked. For example, the Corps questioned the submitted hot water coil because it was much bigger than necessary (R4, tab 53 at 4, tab 62 at 4). The Corps was concerned that the proposed coil would not be compatible with the existing boiler, which was not being replaced (R4, tab 62 at 4; tr. 115). According to ICI's expert, however, the larger coil would not have been a problem and might have benefited the government in the future if it had replaced the boiler (tr. 206-09). We cannot locate any place in the record, however, where ICI explained this to the contracting officer.

42. The contract incorporated FAR 52.233-1, DISPUTES (JUN 2008)[3] (R4, tab 4 at 30). This clause provides in relevant part that "[t]he Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer." ICI did not submit any evidence that it could not find a smaller coil that complied with the contract. And, as we have already found, ICI failed to proceed with the work.

43. We find that ICI has not demonstrated that the Corps acted unreasonably in rejecting the AHU and heating coil. The record indicates that the problems ICI experienced were largely of its own making. ICI has not shown that equipment

---

[3] The contract identified the clause as the June 2008 version of the clause, but most likely meant the July 2002 clause, which was in effect at the time of award. Regardless, the relevant language has not changed.

complying with the specification was not available or even that it would have cost more money than the proposed equipment.

Accident Prevention Plan

44. The contract barred ICI from performing work until it had submitted an accident prevention plan and the Corps had approved it (R4, tab 4 at 15). At the hearing, ICI did not address most of the ACO's grounds for rejecting the accident prevention plan but made three contentions. First, it contended that the ACO erred by stating that the plan failed to identify and document the qualifications of the site safety and health officer, when, in ICI's view, the plan clearly conveyed that Mr. Fortune was the person responsible. However, it would seem that ICI could have cleared up this issue with a brief clarification if it had been of the mind to work with the Corps.

45. The second issue that ICI brought up at the hearing was that the Corps required it to submit a safety plan for a crane, which, in Mr. Fortune's view must have been because the Corps engineer did not know that a 20-ton air handler weighs far less than 20 tons (tr. 173). However, we have reviewed the Corps' rejections of ICI's accident prevention plan (R4, tabs 44, 51) and we do not see any evidence that the Corps rejected the plan for this reason. We have examined the rest of the record and do not see any evidence that supports ICI's contention.

46. Third, ICI contended that the ACO wrongly rejected the accident prevention plan for failing to obtain a permit for working on live electrical panels when ICI had no intention of working on live electrical panels (tr. 173). However, the ACO's second rejection of the plan (the rejection in which this issue came up) does not mention live electrical panels, rather it states: "The Activity Hazard Analysis provided indicates that hot work will be performed but there is no mention of the requirement for a Hot Work Permit and fire watch" (R4, tab 51 at 2). The activity hazard analysis submitted by ICI listed work on refrigerant piping that would involve the following "HAZARDS": "Knocking over acetylene tank. Leaky torch handle. Burning fingers and hands. Charing [sic] painted surfaces." (R4, tab 47 at 3) ICI's accident prevention plan similarly stated that a brazing torch would be used (R4, tab 51 at 9). The Corps safety manual requires hot work permits when performing work such as that proposed by ICI that has a tendency to generate heat, sparks or open flames (supp. R4, tab 68 at 37-38).

47. During the hearing, ICI submitted an email dated 30 April 2014 marked as appellant exhibit 2 in which the project engineer provided Mr. Fortune a blank copy of an energized electrical work permit, which, she stated, "is required for hot electrical work." Whatever confusion this may have caused, no contracting officer ever required ICI to obtain a hot work permit for electrical work it was not actually performing. The

ACO raised a hot work permit because ICI indicated that it was going to perform hot work. ICI did not submit any evidence challenging this basis for a hot work permit.

48. ICI did not submit any evidence at the hearing concerning the ACO's other reasons for rejecting ICI's accident prevention plan, including the lack of provisions for safety training, safety inspections, accident reporting requirements, safety meetings, and safety inspections (R4, tab 44 at 2). We consider them to be abandoned.

Bond Premium

49. ICI complains that the Corps unreasonably delayed in paying its bond premium of about $5,800 (supp. R4, tab 71 at 32). ICI requested payment for the premium sometime in the January-March 2014 time period – its invoice is unsigned and undated (R4, tab 27). The Corps rejected the invoice (*id.*).

50. The contract incorporated FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002). This clause requires an agency to reimburse contractors for bond premiums "after the Contractor has furnished evidence of full payment to the surety." FAR 52.232-5(g). ICI never submitted any evidence that it paid the surety for the bond. Apparently, the contracting officer agreed to pay ICI for the premium in June 2014, not because she concluded that it was entitled to payment but because she was concerned that it was experiencing financial problems (tr. 22-23; R4, tab 45).

51. We find that there is no evidence of government-caused delay due to payment of a bond premium simply because there is no evidence that ICI ever met the conditions for payment specified in the FAR.

Schedule Rejection/Schedule of Values

52. Mr. Fortune testified briefly on both of these issues at the hearing. Based on the claim (albeit not the testimony at the hearing,) the basis for ICI's schedule rejection claim is that the Corps refused to allow ICI to perform work in the fall of 2013[4] (*see* R4, tab 15, tab 71 at 23-25). However, as we have already found, the contract barred ICI from performing work until the Corps approved the accident prevention plan, which ICI did not submit until April 2014 (R4, tab 44) and the Corps never approved. Thus, we conclude that the Corps did not delay the project by rejecting the request to perform work in the fall of 2013.

---

[4] Mr. Fortune mentioned the schedule rejection issue almost in passing at the hearing (tr. 155) but failed to explain why this delayed the project or entitled ICI to money.

53. The Corps rejected the schedule of values when ICI first submitted it but contends that subsequently it approved it when ICI removed a provision providing for payment for mobilization (supp. R4, tab 68 at 35, tabs 84, 87). However, it is not clear from these documents whether the Corps actually approved the schedule. But we see no evidence that this delayed the project because ICI did not submit this schedule until 20 May 2014 (supp. R4, tab 84). By that point all of the issues concerning the late and non-conforming submittals were in full bloom, and Mr. Fortune had been fighting with the Corps over the design for seven months. These issues (and the failure to order the equipment) caused the delays to the project, not this minor spat about the schedule of values.

## Duct Insulation/Duct Submittal

54. ICI contended in the claim that the Corps unreasonably delayed approval of duct insulation and unreasonably denied the ductwork submittal (supp. R4, tab 71 at 32-33). At the hearing, ICI seemed to abandon these contentions (tr. 177). To the extent not abandoned, we find there is a complete failure of proof.

55. The contracting officer denied the delay claim on 22 February 2016. ICI filed ASBCA No. 60491 on 4 March 2016.

## DECISION

FAR 52.249-10(a) provides:

> If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work....

The government bears the burden of demonstrating that ICI did not perform in a timely manner and that it failed to gain approval of its submittals. *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996). Failure to proceed with the work during a dispute is a ground for termination for default. *Preuss v. United States*, 412 F.2d 1293, 1301-02 (Ct. Cl. 1969). In this appeal, it is undisputed that ICI failed to complete the work on time, failed to proceed with the work after the Corps rejected its proposed changes to the project, and failed to furnish some submittals and failed to gain approval of other submittals. The government has made a prima facie case for default termination; ICI must, therefore, prove that its nonperformance was excusable. *DCX*, 79 F.3d at 134.

We have already rejected ICI's contentions that the government delayed the project. Rather, the record makes it clear that ICI delayed the project because it disagreed with the government's design choices (*see* findings 7, 9-10, 12-14, 18, 22-23) and failed to provide timely or complete submittals (findings 8, 10-11, 15-17, 19-22, 25). The record strongly suggests that ICI has a basic misunderstanding as to its role as a contractor on a government project. Despite ICI's views to the contrary, and as we now discuss, government contractors must perform the contracts they execute and cannot require the government to rewrite the contract so that they can build some other project they like better.

It is well settled that the government is entitled to enforce its contracts so that it receives the work product provided for in the contract. *J.L. Malone & Assocs., Inc. v. United States*, 879 F.2d 841, 845 (Fed. Cir. 1989). The government enjoys considerable leeway in determining what to specify. The Federal Circuit has held in the context of selecting the performance of air conditioning equipment that the "government may require performance both in excess of, or below, the standard normally accepted in a trade." *Interwest Constr. v. Brown*, 29 F.3d 611, 615 (Fed. Cir. 1994) (quoting *Ralph Larsen & Son, Inc. v. United States*, 17 Cl. Ct. 39, 46 (1989)).

A number of cases from the Federal Circuit and the Court of Claims demonstrate that the contractor's role is to build the project for which it made a binding promise, not some contract that, in hindsight, it believes is more appropriate or makes more sense. For example, in *J.L. Malone & Assocs.*, 879 F.2d 841, an agency awarded a contract to replace an outdated fire alarm system and to upgrade an existing computer system. Instead, of upgrading the existing computer, the contractor offered to replace it with a new computer. When the contracting officer declined, the contractor proceeded with the work and submitted a claim. *Id.* at 844.

The Federal Circuit affirmed a Veterans Administration Board of Contract Appeals decision denying the appeal. While the new computer would have been more advanced than the existing computer, the Federal Circuit held that the agency had no obligation to alter the basic design requirements. *J.L. Malone & Assocs.*, 879 F.2d. at 846. The court of appeals agreed with the board that it would have been unfair to other bidders to approve such a major change to the contract after the fact because they would not have anticipated when they prepared their bids that the agency would approve such a major change. *Id.* at 845.

Similarly, in *Farwell Co. v. United States*, 148 F. Supp. 947 (Ct. Cl. 1957), the contract required either copper or brass pipe be supplied, but the contractor attempted to use cheaper copper tubing, which it contended would give equally satisfactory results. As the Court of Claims explained:

14

It is of no concern to plaintiff why the Government specified brass or copper "pipe" instead of "tubing," and it was not within plaintiff's province to substitute its judgment for that of the Government by deciding that tubing was satisfactory when pipe was specified. The Government may have had many reasons for requiring pipe instead of tubing, but in any event the specifications called for pipe and the Government had a right to expect that pipe would be used. In other words, why have a contract if either party could change the terms thereof to suit his particular whim.

*Id.* at 949. The Court of Claims also held that it would have been unfair to other bidders to allow the plaintiff to substitute the tubing. *Id.* at 950. If the other bidders had calculated their bids based on the use of pipe, the plaintiff would have had an advantage over them. The use of specifications insures uniformity of bidding. *Id.*

During this project, ICI repeatedly informed the Corps of its opinion that the design of the existing system was defective and that it was a mistake to keep that design and add bigger equipment (findings 7, 9, 12, 14). The Corps considered ICI's point of view but elected to continue with its design (findings 9, 13, 19, 21-22, 24). At that point, ICI's only option was to build the project it had signed up to do. Instead, it kept dragging its feet and virtually forced the contracting officer to terminate the contract for default.

While there is evidence in the record that ICI underbid the job and did not include all of the equipment in its bid (finding 34), during the hearing, ICI portrayed itself as animated by safety concerns. We need not address whether there is a safety exception to the rule that the contractor must build as designed. *See Salisbury Special Tool Co.*, ASBCA No. 37530, 89-2 BCA ¶ 21,838 at 109,873. The undisputed evidence showed that the basic design had been in place for some time (findings 1, 13), and there was no evidence that the design caused any ill effects to the building occupants. During the hearing, ICI's expert disagreed with its contention that the design violated the building code (findings 32, 36), and there is no evidence that increasing the size of the HVAC equipment would create safety problems. While ICI continues to contend in its post-hearing brief that the specifications were defective, there is an absence of supporting evidence. In sum, any safety concerns that ICI had are unproven.

With respect to the submittals, there is no evidence that the contracting officer or other Corps personnel acted unreasonably. As we have found, ICI furnished the submittals months late, or not at all (findings 15, 25). Any such delays are entirely the fault of ICI. The Corps rejected several of the product submittals but showed a

15

willingness to work through the issues that came up (findings 13-14, 17, 19). In rejecting the submittals, the Corps made specific comments or asked specific questions that ICI should have been able to address (finding 15) if the equipment complied with the specifications. ICI failed to cooperate with the Corps and its attempts to work through the submittal process were half-hearted and sporadic.

Finally, we also observe that ICI's failure to obtain approval of the accident prevention plan made it impossible to perform any work on the project (finding 16). The ACO provided a number of reasons for rejection of the plan, many of which ICI failed to challenge at the hearing and which we found had been abandoned (finding 48). We rejected ICI's other contentions concerning the accident prevention plan (findings 44-47). The failure to obtain approval of the accident prevention plan was a delay caused entirely by ICI that by itself prevented contract performance.

We have examined ICI's numerous contentions of government-caused delays and have found them to be lacking. ICI is not entitled to have the termination for default set aside, nor is it entitled to recover on its delay claim.

## CONCLUSION

These appeals are denied.

Dated: 10 March 2017

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

16

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59622, 60491, Appeals of Industrial Consultants, Inc. DBA W. Fortune & Company, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals